**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MMA GROUP 1 INC. d/b/a | : | |
| TOBACCO HUT STATE COLLEGE | : | CIVIL ACTION NO. _____ |
| INC., TOBACCO HUT ALTOONA 1 | : | |
| INC., TOBACCO HUT AT | : | |
| HERMITAGE INC., TOBACCO HUT | : | |
| BUTLER INC., TOBACCO HUT | : | |
| BUTLER 2 INC., TOBACCO HUT | : | |
| CARLISLE INC., TOBACCO HUT | : | |
| CHAMBERSBURG INC., MAGD | : | |
| GROUP INC. d/b/a TOBACCO HUT | : | |
| EPHRATA INC., TOBACCO HUT | : | |
| GETTYSBURG 1 INC., ALAMINE | : | |
| INC. d/b/a TOBACCO HUT | : | |
| GREENSBURG INC., TOBACCO | : | |
| HUT HANOVER INC., TOBACCO | : | |
| HUT HARRISBURG 1 INC., | : | |
| TOBACCO HUT HARRISBURG 2 | : | |
| INC., TOBACCO HUT JOHNSTOWN | : | |
| 1 INC., TOBACCO HUT | : | |
| LANCASTER 1 INC., TOBACCO | : | |
| HUT LITTLETOWN INC., | : | |
| TOBACCO HUT MECHANICSBURG | : | |
| INC., TOBACCO HUT | : | |
| MECHANICSBURG 2 INC., | : | |
| TOBACCO HUT PARKVILLE INC., | : | |
| TOBACCO HUT SHARON INC., | : | |
| TOBACCO HUT WAYNESBORO | : | |
| INC., TOBACCO HUT WILKES- | : | |
| BARRE INC., TOBACCO HUT | : | |
| YORK 1 INC., TOBACCO HUT | : | |
| YORK 2 INC., TOBACCO HUT | : | |
| YORK 3 INC., TOBACCO HUT & | : | |
| GIFT CHAMBERSBURG INC., | : | |
| TOBACCO LUX CHAMBERSBURG | : | |
| INC., TOBACCO LUX YORK INC., | : | |
| THV 54 INC., THV 56 INC., THV 71 | : | |
| INC., RTH 3 INC., RTH 3B INC., | : | |

NOVA DISTRO, INC., and 101 DISTRIBUTORS LLC,

        Plaintiffs,

        v.

DAVID W. SUNDAY, JR., in his official capacity as Attorney General of the Commonwealth of Pennsylvania, and PATRICK M. BROWNE, in his official capacity as Secretary of Revenue of the Commonwealth of Pennsylvania,

        Defendants.

      :
      :
      :
      :
      :
      :
      :
      :
      :
      :
      :
      :

---

## VERIFIED COMPLAINT

---

AND NOW, Plaintiffs MMA Group 1 Inc. d/b/a Tobacco Hut State College Inc., Tobacco Hut Altoona 1 Inc., Tobacco Hut at Hermitage Inc., Tobacco Hut Butler Inc., Tobacco Hut Butler 2 Inc., Tobacco Hut Carlisle Inc., Tobacco Hut Chambersburg Inc., Magd Group Inc. d/b/a Tobacco Hut Ephrata Inc., Tobacco Hut Gettysburg 1 Inc., ALAMINE Inc. d/b/a Tobacco Hut Greensburg Inc., Tobacco Hut Hanover Inc., Tobacco Hut Harrisburg 1 Inc., Tobacco Hut Harrisburg 2 Inc., Tobacco Hut Johnstown 1 Inc., Tobacco Hut Lancaster 1 Inc., Tobacco Hut Littletown Inc., Tobacco Hut Mechanicsburg Inc., Tobacco Hut Mechanicsburg 2 Inc., Tobacco Hut Parkville Inc., Tobacco Hut Sharon Inc., Tobacco Hut Waynesboro Inc., Tobacco Hut Wilkes-Barre Inc., Tobacco Hut York 1 Inc., Tobacco Hut York 2

Inc., Tobacco Hut York 3 Inc., Tobacco Hut & Gift Chambersburg Inc., Tobacco Lux Chambersburg Inc., Tobacco Lux York Inc., THV 54 Inc., THV 56 Inc., THV 71 Inc., RTH 3 Inc., RTH 3B Inc. (collectively "Tobacco Hut"), Nova Distro, Inc. ("Nova Distro"), and 101 Distributors LLC ("101 Distributors," and together with Tobacco Hut and Nova Distro, "Plaintiffs"), by and through their counsel, Babst, Calland, Clements & Zomnir, P.C. and Moran Reeves & Conn, P.C.,[1] assert the following causes of action against Defendants David W. Sunday, Jr. ("AG Sunday") in his official capacity as the Attorney General of Pennsylvania and Patrick M. Browne ("Secretary Browne") in his official capacity as the Secretary of Revenue of Pennsylvania (collectively "Defendants"), and in support thereof, aver the following based on Plaintiffs' most recent knowledge, information, and reasonable belief:

## **INTRODUCTION**

1. This case involves a constitutional challenge to Act 57 of 2025, a recently enacted Pennsylvania statute that conditions the manufacture, wholesale, and retail sale of electronic nicotine delivery systems ("ENDS"), commonly known as e-cigarettes or vapes, on federal regulatory compliance.

---

[1] *Pro hac vice* applications for counsel associated with Moran Reeves & Conn, P.C. are being filed contemporaneously with the instant Verified Complaint.

2. The Federal Food and Drug Administration ("FDA") has regulated e-cigarettes containing nicotine derived from tobacco since 2016 and e-cigarettes containing nicotine derived from any source since 2022.

3. In doing so, the FDA has required e-cigarettes and other ENDS products to submit a Premarket Tobacco Product Application ("PMTA") and receive a "marketing granted order" before introduction into the market.

4. The PMTA process is time-consuming and expensive, with application costs estimated to exceed $500,000.

5. To date, the FDA has issued only 45 marketing granted orders for e-cigarettes—almost all of which are manufactured, marketed, and/or sold by the largest tobacco companies in the United States.

6. At the same time, however, the FDA has recognized that forcing unauthorized ENDS products off the market might result in users reverting to more harmful traditional cigarettes.

7. The FDA has therefore sought to strike a balance between the risk that e-cigarettes pose to youth, on the one hand, and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes, on the other.

8. To that end, the FDA has consistently exercised its enforcement discretion with respect to unauthorized e-cigarettes on a case-by-case basis to allow most such products to remain on the market.

9. And the FDA has adhered to this discretionary enforcement policy across multiple presidential administrations—and the resultant changes of FDA Commissioners over that time.

10. Unhappy with that regime, the nation's largest tobacco companies have unsuccessfully challenged or sought to bypass the FDA's enforcement discretion as part of an effort to exclude competing e-cigarettes from the market.

11. In 2023, for instance, the FDA denied a Citizen Petition submitted by RAI Services Company, an affiliate of R.J. Reynolds Tobacco Company, that requested the FDA end its case-by-case enforcement policy in favor of an enforcement policy targeting e-cigarettes without pending PMTAs or marketing granted orders.

12. By way of another example, in 2024, the U.S. International Trade Commission ("ITC") dismissed a complaint filed by R.J. Reynolds Tobacco Company and R.J. Reynolds Vapor Company that would have bypassed the FDA entirely by barring from importation any e-cigarettes without pending PMTAs or marketing granted orders.

13. Soon after R.J. Reynolds' failed efforts to exclude competing e-cigarettes at the federal level, state legislatures across the country began to introduce legislation that would operate as a *de facto* ban on e-cigarettes without pending PMTAs or marketing granted orders.

14. In at least one instance lobbyists for R.J. Reynolds and Altria (maker of Marlboro and Virginia Slims cigarettes) immediately declared their public support for the bill.

15. But as multiple courts have already determined, a state statute providing a *de facto* ban on e-cigarettes is preempted under the Supremacy Clause of the United States Constitution because it usurps the exclusive enforcement role of the FDA in this area. *See Iowans for Alts. to Smoking & Tobacco, Inc. v. Iowa Dep't of Rev.*, 781 F. Supp. 3d 724 (Iowa 2025), attached hereto as "**Exhibit A**;" *Nova Distro, Inc. v. Miyares*, No. 3:25–cv–857–DJN, 2025 WL 3680321 (E.D. Va. Dec. 18, 2025), attached hereto as "**Exhibit B**;" *see also Vapor Tech. Ass'n v. Marshall*, 03–CV–2025–901284 (Ala. Cir. Ct.—Montgomery Cnty. Aug. 15, 2025), attached hereto as "**Exhibit C**."

16. Against this backdrop, on December 22, 2025, the Pennsylvania General Assembly enacted Act 57 of 2025 ("Act 57").

17. Similar to the statutes passed in Alabama, Iowa, and Virginia, Act 57 bans the manufacture, retail sale, and purchase of any e-cigarettes in Pennsylvania without a pending PMTA or marketing granted order.

18. Plaintiffs manufacture, distribute, and/or sell e-cigarettes in Pennsylvania without a pending PMTA or marketing granted order, and therefore, are directly impacted by the *de facto* ban established by Act 57.

19. Plaintiffs thus bring this action to declare what they term the "Act 57 Enforcement Provisions" unconstitutional on preemption and due process grounds and enjoin AG Sunday and Secretary Browne from implementing or enforcing the same.

## PARTIES

20. MMA Group 1 Inc. d/b/a Tobacco Hut State College Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1692 North Atheron Street, State College, Pennsylvania 16803–1416.

21. Tobacco Hut State College Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

22. Tobacco Hut Altoona 1 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 100 West Plank Road, Altoona, Pennsylvania 16602–3012.

23. Tobacco Hut Altoona 1 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

24. Tobacco Hut at Hermitage Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 2952 East State Street, Hermitage, Pennsylvania 16148–2757.

25. Tobacco Hut at Hermitage Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

26. Tobacco Hut Butler Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 255 New Castle Road, Butler, Pennsylvania 16001–2531.

27. Tobacco Hut Butler Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

28. Tobacco Hut Butler 2 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 419 Hansen Avenue, Butler, Pennsylvania 16001–5625.

29. Tobacco Hut Butler 2 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

30. Tobacco Hut Carlisle Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 853 North Hanover Street, Carlisle, Pennsylvania 17013–1539.

31. Tobacco Hut Carlisle Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

32. Tobacco Hut Chambersburg Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1515 Lincoln Way East, Suite 2, Chambersburg, Pennsylvania 17201.

33. Tobacco Hut Chambersburg Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

34. Magd Group Inc. d/b/a Tobacco Hut Ephrata Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 875 East Main Street, Ephrata, Pennsylvania 17522–2545.

35. Tobacco Hut Ephrata Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

36. Tobacco Hut Gettysburg 1 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 756 York Road, Gettysburg, Pennsylvania 17325.

37. Tobacco Hut Gettysburg 1 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

38. ALAMINE Inc. d/b/a Tobacco Hut Greensburg Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 5105 US Route 30, Unit B & C, Greensburg, Pennsylvania 15601–3651.

39. Tobacco Hut Greensburg Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

40. Tobacco Hut Hanover Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1001 Carlisle Street, Hanover, Pennsylvania 17331.

41. Tobacco Hut Hanover Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

42. Tobacco Hut Harrisburg 1 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 3725 Walnut Street, Harrisburg, Pennsylvania 17109.

43. Tobacco Hut Harrisburg 1 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

44. Tobacco Hut Harrisburg 2 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 4800 Jonestown Road, Harrisburg, Pennsylvania 17112.

45. Tobacco Hut Harrisburg 2 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

46. Tobacco Hut Johnstown 1 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1459 Scalp Avenue, Johnstown, PA 15904–3301.

47. Tobacco Hut Johnstown 1 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

48. Tobacco Hut Lancaster 1 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1400 Manheim Pike, Lancaster, Pennsylvania 17601–3126.

49. Tobacco Hut Lancaster 1 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

50. Tobacco Hut Littletown Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 410 West King Street, Littlestown, Pennsylvania 17340.

51. Tobacco Hut Littletown Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

52. Tobacco Hut Mechanicsburg Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 6005 Carlisle Pike, Mechanicsburg, Pennsylvania 17050.

53. Tobacco Hut Mechanicsburg Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

54. Tobacco Hut Mechanicsburg 2 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 4909 Carlisle Pike, Mechanicsburg, Pennsylvania 17050.

55. Tobacco Hut Mechanicsburg 2 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

56. Tobacco Hut Parkville Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1055 Baltimore Street, Hanover, Pennsylvania 17331.

57. Tobacco Hut Parkville Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

58. Tobacco Hut Sharon Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1138 Easte State Street, Suite B, Sharon, Pennsylvania 16146–3338.

59. Tobacco Hut Sharon Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

60. Tobacco Hut Waynesboro Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1404 East Main Street, Waynesboro, Pennsylvania 17268.

61. Tobacco Hut Waynesboro Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

62. Tobacco Hut Wilkes-Barre Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1022 Highway 315, Wilkes-Barre, Pennsylvania 18702.

63. Tobacco Hut Wilkes-Barre Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

64. Tobacco Hut York 1 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 2908 East Market Street, York, Pennsylvania 17402.

65. Tobacco Hut York 1 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

66. Tobacco Hut York 2 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1401 Carlisle Road, York, Pennsylvania 17408.

67. Tobacco Hut York 2 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

68. Tobacco Hut York 3 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 2181 South Queen Street, York, Pennsylvania 17402.

69. Tobacco Hut York 3 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

70. Tobacco Hut & Gift Chambersburg Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1001 Wayne Avenue, Chambersburg, Pennsylvania 17201.

71. Tobacco Hut & Gift Chambersburg Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

72. Tobacco Lux Chambersburg Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1070 Lincoln Waye East, Chambersburg, Pennsylvania 17201.

73. Tobacco Lux Chambersburg Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

74. Tobacco Lux York Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 3760 East Market Street, York, Pennsylvania 17402.

75. Tobacco Lux York Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

76. THV 54 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1080 Old Bethlehem Pike, Colmar, Pennsylvania 18915.

77. THV 54 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

78. THV 56 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 728 Bethlehem Pike, Montgomeryville, Pennsylvania 18936.

79. THV 56 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

80. THV 71 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 601 West Strasburg Road, West Chester, Pennsylvania 19382.

81. THV 71 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

82. RTH 3 Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1009 West Chester Pike, West Chester, Pennsylvania 19382–5067.

83. RTH 3 Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

84. RTH 3B Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 3 North 5 Points Road, West Chester, Pennsylvania 19380–4782.

85. RTH 3B Inc. is engaged in the retail sale of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

86. Nova Distro is a Virginia corporation registered to do business in the Commonwealth of Pennsylvania.

87. Nova Distro has a principal place of business of 10110 Battleview Parkway, Unit 114, Manassas, Virginia 20109.

88. Nova Distro is engaged in manufacturing and the wholesale distribution of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

89. 101 Distributors is a Pennsylvania limited liability company with a principal place of business located at 2771 Paxton Street, Harrisburg, Pennsylvania 17111.

90. 101 Distributors is engaged in the wholesale distribution of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders from the FDA.

91. AG Sunday is the Attorney General of Pennsylvania, and for the purposes of this lawsuit, is sued in his official capacity.

92. AG Sunday's office is located at 393 Walnut Street, Harrisburg, Pennsylvania 17120.

93. Secretary Browne is the Secretary of Revenue of Pennsylvania, and for the purposes of this lawsuit, is sued in his official capacity.

94. Secretary Browne's office is located at 1131 Strawberry Square, Harrisburg, Pennsylvania 17128.

## JURISDICTION AND VENUE

95.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it asserts claims for declaratory and injunctive relief based on the Supremacy Clause of the United States Constitution.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *see also St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 241–42 (3d Cir. 2000).  *See generally Planned Parenthood of Hou. & Se. Tex. v. Sanchez*, 403 F.3d 324, 331 (5th Cir. 2005) ("It is well-established that federal courts have jurisdiction under 28 U.S.C. § 1331 over a preemption claim seeking injunctive and declaratory relief.")

96.    This Court also has federal question over this action pursuant to 28 U.S.C. § 1343, because it asserts claims for declaratory and injunctive relief under 42 U.S.C. § 1983 based on the due process clause of the Fourteenth Amendment to the United States Constitution.

97.    Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391, because the events giving rise to Plaintiffs' claims occurred within this judicial district, 28 U.S.C. § 1391(b)(2), and because AG Sunday and Secretary Browne are both considered to reside within this judicial district, 28 U.S.C. § 1391(b)(1).

## SUMMARY OF ACTION

### Federal Preemption Framework

98. The Supremacy Clause of the United States Constitution provides that the Constitution, federal laws, and treaties "shall be the supreme Law of the Land . . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

99. From this constitutional command flows the principle that state laws that interfere with or are contrary to federal law must yield. *See*, *e.g.*, *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368 (1986).

100. Federal preemption takes several forms.

101. Congress may expressly preempt state law through clear statutory language. *See*, *e.g.*, *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 126 (3d Cir. 2010).

102. Alternatively, preemption may be implied when Congress enacts a regulatory scheme "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (internal citation omitted).

103. Implied preemption also encompasses conflict preemption, which occurs in two circumstances: when compliance with both state and federal law is physically impossible; or when state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal citation omitted).

104. This latter form—obstacle preemption—requires careful assessment of both the federal regulatory scheme and the challenged state law to determine whether the state law frustrates federal purposes.

105. Congressional intent remains the touchstone of all preemption analyses. *See Medtronic v. Lohr*, 518 U.S. 470, 485 (1996).

106. Courts must examine the statutory text, structure, and purpose to discern this intent.

107. Where Congress includes an express preemption clause, the analysis properly begins with the plain language of that provision. *See CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

**The Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking and Tobacco Control Act**

108. In 1938, Congress enacted the Federal Food, Drug, and Cosmetic Act 21 U.S.C. §§ 301–399j (the "FDCA").

109. The FDCA authorizes the FDA to evaluate the safety, labeling and marketing of drugs, medical devices, and other regulated products before they are allowed in the market. 21 U.S.C. §§ 331–360.

110. At its core, the FDCA prohibits the introduction of adulterated or misbranded products, requires manufacturers to submit evidence demonstrating

20

safety and effectiveness (where applicable), and empowers the FDA to determine whether a product may be lawfully sold.  21 U.S.C. §§ 351–352, 355.

111.   Congress amended the FDCA in 2009 through the Family Smoking Prevention and Tobacco Control Act, Public L. No. 111-31, 123 St. 1776 (2009) (the "TCA").

112.   The TCA extended the FDA's regulatory authority to "new tobacco products" and imposed federal approval requirements on such products before they can be sold in the market. 123 Stat. 1776 (2009).

113.   For purposes of the TCA, "new tobacco products" are defined as tobacco products that were not commercially marketed in the United States as of February 15, 2007.  21 U.S.C. § 387j(a)(1)(A).

114.   The FDA initially did not classify e-cigarettes as new tobacco products subject to the FDCA.

115.   In 2016, however, the FDA issued regulations interpreting new tobacco products to include e-cigarettes containing nicotine derived from tobacco.  81 Fed. Reg. 29,028–29,044 (May 10, 2016).

116.   In 2022, Congress amended the TCA to clarify that new tobacco products also include e-cigarettes containing nicotine derived from non-tobacco (*i.e.*, synthetic) sources.  Pub. L. No. 117–103, 136 St. 789 (2022) (codified at 21 U.S.C. § 321(rr)(1)).

117. Under the TCA's amendments, manufacturers of new tobacco products must submit PMTAs and receive marketing granted orders from the FDA before releasing their products on the market. *See Avail Vapor, LLC v. FDA*, 55 F.4th 409, 414 (4th Cir. 2022).

118. Between October 2019 and February 2023, approximately 26 million different PMTAs for e-cigarettes were submitted to the FDA by more than 500 different companies.

119. The FDA has only granted marketing authorization to 45 e-cigarettes to date.

120. 39 of those 45 e-cigarettes (or over 86%) are manufactured by four companies: Juul Labs, Inc.; Logic Technology Development, LLC; NJOY, LLC; and R.J. Reynolds Vapor Company. *See E-Cigarettes Authorized by the FDA,* U.S. Food & Drug Administration (July 2025), https://bit.ly/4s1ZelY (last visited May 14, 2026).

121. "Most ENDS products on the market today lack FDA marketing authorization." *Iowans for Alts. to Smoking & Tobacco*, 781 F. Supp. 3d at 728.

### FDA Enforcement of the FDCA

122. The FDA has the exclusive authority to enforce the FDCA.

123. Under Section 337 of the FDCA, "all … proceedings for the enforcement, or to restrain violations" of the FDCA "shall be by and in the name of the United States." 21 U.S.C. § 337(a).

124. The United States Supreme Court has recognized that the language of Section 337(a) is "clear evidence that Congress intended" the FDCA to be "enforced exclusively by the Federal Government." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349, 352 (2001).

125. Courts have consistently applied this principle across various contexts within the FDCA's regulatory framework.

126. The United States Court of Appeals for the First Circuit, for example, has held that state-law claims existing "solely by virtue" of an FDCA violation are impliedly preempted because Congress reserved enforcement authority to the federal government alone. *See Plourde v. Sorin Grp. USA, Inc.*, 23 F.4th 29, 33 (1st Cir. 2022).

127. The United States District Court for the District of Columbia has similarly held that, "if the state law claim would not exist in the absence of the FDCA, then the plaintiff is effectively suing for a violation of the FDCA (no matter how the plaintiff labels the claim), and the plaintiff's claim is thus impliedly preempted under *Buckman*." *Kubicki ex rel. Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 173 (D.D.C. 2018) (per Brown Jackson, J.) (cleaned up).

23

128. Likewise, the United States Court of Appeals for the Ninth Circuit has affirmed that proceedings addressing FDCA violations "must be by and in the name of the United States, not a private party." *Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1049 (9th Cir. 2022).

129. This consistent interpretation "reflects Congress's deliberate choice to centralize enforcement authority [of the FDCA] in the federal government." *Iowans for Alts. to Smoking & Tobacco*, 781 F. Supp. 3d at 736.

130. Since 2016, when ENDS products first became subject to FDA regulation, the FDA has exercised enforcement discretion regarding unauthorized e-cigarettes, adjusting its enforcement policies at least seven times.

131. As the FDA has recognized, immediately forcing all unauthorized e-cigarettes off the market could result in e-cigarette users reverting to more harmful traditional cigarettes.

132. Accordingly, the FDA has sought to strike a balance between the risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes.

133. Since September 2021, the FDA has exercised its enforcement discretion with respect to unauthorized e-cigarettes on a case-by-case basis.

134. When Congress enacted the TCA, it did not amend or displace the FDA's exclusive enforcement authority under Section 337(a).

135. Congress instead included a carefully structured, three-part preemption scheme consisting of a Preservation Clause, a Preemption Clause, and a Savings Clause.

136. The Preservation Clause provides, in relevant part:

Except as provided in paragraph (2)(A) [the Preemption Clause], nothing in this subchapter … shall be construed to limit the authority of a … State or political subdivision of a State … [to] enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter … relating to or prohibiting the sale, distribution, possession, … or use of tobacco products by individuals of any age, [or] information reporting to the State ….”

21 U.S.C. § 387p(A)(1).

137. The Preemption Clause provides, in relevant part:

No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

21 U.S.C. § 387p(a)(2)(A).

138. The Savings Clause provides, in relevant part:

Subparagraph (A) [the Preemption Clause] does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products.

21 U.S.C. § 387p(a)(2)(B).

139. Courts addressing the preemptive scope of Section 337(a) and Section 337(p) have generally confirmed that "while states retain some regulatory authority over tobacco products, that authority does not grant states enforcement authority over the FDCA." *Nova Distro*, 2025 WL 3680321, at *12.

**Efforts by Big Tobacco to Limit or Bypass FDA's Enforcement Authority**

140. The FDA has consistently resisted efforts by the nation's largest tobacco companies to limit or bypass its enforcement discretion.

141. In 2023, RAI Services Company, an R.J. Reynolds affiliate, filed a Citizens Petition on behalf of itself and its affiliated tobacco companies with the FDA requesting that the agency adopt a "new enforcement" because the FDA "was not [doing] enough" to prevent underage use of unauthorized ENDS products. Reynolds' Citizen Petition at 3 (Feb. 6, 2023), attached hereto as "**Exhibit D**."

142. The proposed policy would have excluded R.J. Reynolds' own unauthorized Vuse brand ENDS products from enforcement because they were on the market by August 8, 2016, and R.J. Reynolds had submitted PMTAs for those products by September 9, 2020.

143. But R.J. Reynolds' justification for excluding its unauthorized ENDS from enforcement was pretextual because R.J. Reynolds' proposed policy would have offered no safe harbor for ENDS products with non-tobacco-derived nicotine—

even if the product had a pending PMTA that had been timely filed when Congress made those products subject to the FDCA in April 2022.

144. In other words, R.J. Reynolds' proposed enforcement policy was aimed at protecting the company's sales of its own unauthorized ENDS and e-cigarettes; it was not aimed at reducing youth usage of ENDS.

145. The FDA denied the Petition in November 2023. *See* Letter from May D. Nelson to John O'Brien, Docket No. FDA–2023–P–0430 (Nov. 14, 2023), attached hereto as "**Exhibit E**."

146. In doing so, the FDA told R.J. Reynolds:

> [W]e do not agree that FDA has taken insufficient compliance and enforcement action against illegally marketed ENDS products, to include disposable ENDS and e-liquid products. To the contrary, we believe that FDA's comprehensive approach to this matter has demonstrated the Agency's robust commitment to implementing and enforcing the law with respect to such products (including restricting such unauthorized products from the lawful marketplace) and preventing their access to and promotion of use by youth.

(Ex. E at 4.)

147. The FDA also provided R.J. Reynolds with a three-page, single-spaced summary of the various regulatory and enforcement actions the agency had taken to prevent youth usage of ENDS. (*Id.* at 5-7).

148. The FDA then wrote "[g]iven all of [those] regulatory and enforcement actions," it was "clear that FDA has been taking critical compliance and enforcement efforts targeting [unauthorized] ENDS products." (*Id.* at 8).

27

149.  The FDA further assured R.J. Reynolds that the agency "is continuously evaluating new information and, in making enforcement decisions, taking into account data on youth use and other risk factors."  (*Id.*).

150.  The FDA concluded by writing:

[W]e disagree with your assertions that 'there is an existing loophole in FDA's current tobacco enforcement efforts, especially when it comes to youth' and that 'FDA has done little to remove these products from the market.'  To the contrary, FDA is committed to the enforcement of federal laws, regulations, enforcement policy and priorities related to tobacco products, including disposable ENDS products containing both [non-tobacco nicotine] and [tobacco-derived nicotine], especially to prevent the marketing of ENDS that are 'most appealing and accessible to youth.'

(*Id.* (footnotes omitted)).

151.  While its Citizen Petition to the FDA was pending, R.J. Reynolds also filed a complaint at the ITC asking the Commission to, *inter alia,* bar the importation of the same products that R.J. Reynolds asked FDA to target via its Citizen Petition. *See Re: Complaint Filed by R.J. Reynolds Tobacco Co. & R.J. Reynolds Vapor Co. Concerning Certain Disposable Vaporizer Devices & Components & Packaging Thereof*, No. 337-TA-1381, 2023 WL 11932250, at \*1 (U.S. Intern. Trade Comm'n Dec. 15, 2023), attached hereto as "**Exhibit F**."

152.  After learning about R.J. Reynolds' ITC complaint, the FDA filed a letter with the ITC urging it to reject R.J. Reynolds' attempt to use the Commission

to enforce the FDCA.  Letter from FDA to the U.S. International Trade Commission (Oct. 27, 2023), attached hereto as "**Exhibit G**."

153.   Citing Section 337(a), the FDA noted that Congress wants "decisions about the regulatory or compliance status of tobacco products and what products should be prioritized for enforcement [to] reflect the views of the agency charged with administering the FDCA."  (Ex. G at 2).

154.   The FDA also asserted that Section 337(a) reflects congressional intent to have "uniform administration of the FDCA."  (*Id.*).

155.   The ITC ultimately dismissed R.J. Reynolds' claim, reasoning that "the decision whether to exclude unauthorized ENDS products from the market is a determination that is squarely within the authority of the FDA, and it would usurp the FDA's authority to enforce the FDCA and impermissibly grant a private right of action to enforce the FDCA if the Commission were to institute an investigation based on the Reynolds complaint."  *Re: Complaint Filed by R.J. Reynolds Tobacco Co. & R.J. Reynolds Vapor Co. Concerning Certain Disposable Vaporizer Devices & Components & Packaging Thereof*, No. 337-TA-1381, 2023 WL 11932250, at \*2 (Dec. 15, 2023).

**State Response to Perceived Underenforcement of the FDCA's Preauthorization Scheme**

156.   Due to the perceived underenforcement of the FDCA's preauthorization scheme by the FDA, several states have recently enacted state regulatory

frameworks empowering state officials (and, in some cases, private parties) to take action against e-cigarettes without pending PMTAs or marketing granted orders.

157. At least 13 states had adopted so-called e-cigarette "registry laws" prior to December 2025, including Alabama, Iowa, and Virginia:

*State E-Cigarette Registry Bill Map*

State E-Cigarette Registry Bill Map, Public Health Law Center at Mitchell Hamline School of Law, https://bit.ly/4bxnibz (last accessed May 15, 2026).

158. "The[se] tobacco-industry backed registry laws are supposedly intended to fill the enforcement void left by FDA inaction." State E-Cigarette

30

Registry Bills and What to Make of Them, Public Health Law Center at Mitchell Hamline School of Law, https://bit.ly/4dcvgrU (last visited May 15, 2026).

159. While these laws vary slightly by jurisdiction, each law contains the same four characteristics.

160. First, manufacturers of e-cigarettes must certify to a state agency that their products have received marketing granted orders from the FDA or are the subject of pending PMTAs. *See*, *e.g.*, Ala. Code 1975 § 28–11–17.1(a)(1); Iowa Code Ann. § 453A.52(1); Va. Code Ann. § 59.1–293.16(A).

161. Second, all e-cigarettes so certified are added to a statewide directory. *See*, *e.g.*, Ala. Code 1975 § 28–11–17.1(c); Iowa Code Ann. § 453A.52(5); Va. Code Ann. § 59.1–293.15.

162. Third, all e-cigarettes not contained in the statewide directory (*i.e.*, all e-cigarettes without pending PMTAs or marketing granted orders) are barred from sale. *See*, *e.g.*, Ala. Code 1975 § 28–11–17.1(h); Iowa Code Ann. § 453A.52A; Va. Code Ann. § 59.1–293.20(A)–(B).

163. Fourth, persons violating the sales prohibition are subject to a series of increasing civil penalties. *See, e.g.,* Ala. Code 1975 § 28–11–17.1(i) & –(j); Iowa Code Ann. § 453A.52B; Va. Code Ann. § 59.1–293.20(C)–(D).

**Decisions Interpreting Constitutionality of Registry Laws**

164. Several of the adopted Registry Laws have been temporarily restrained or enjoined before they could take effect.

165. In *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Department of Revenue*, the U.S. District Court for the Southern District of Iowa addressed the legality of Iowa House File 2677.

166. Enacted in 2024, Iowa House File 2677 directed the Iowa Department of Revenue to impose monetary penalties and take other enforcement actions against manufacturers and sellers of ENDS products that have not received marketing authorization from the FDA.

167. The statutory scheme contemplated the creation of a registry of permissible ENDS products.

168. Under Iowa House File 2677, ENDS manufacturers whose products are sold in Iowa must certify to the Iowa Department of Revenue that their products either: (1) have received FDA marketing authorization, or (2) were on the market as of August 8, 2016 (*i.e.*, the date ENDS containing tobacco-derived nicotine became subject to the FDCA) and had a PMTA filed with FDA by September 9, 2020, that remains under FDA review or is the subject of ongoing litigation.

169. Per Iowa House File 2677, once the Iowa Department of Revenue published its registry, the sale of ENDS products not listed in the registry became unlawful in Iowa.

170. The U.S. District Court for the Southern District of Iowa held that House File 2677 "impermissibly intrudes upon the federal government's exclusive authority to enforce the FDCA," adding: "Although Iowa retains broad police powers to regulate the sale of tobacco products within its borders, it may not condition market access on compliance with federal authorization standards in a manner that effectively transfers the FDA's enforcement discretion to state authorities." 781 F. Supp. 3d at 744.

171. The District Court therefore enjoined the Director of the Iowa Department of Revenue from implementing and enforcing certain provisions of Iowa House File 2677.

172. More recently, in *Nova Distro, Inc. v. Miyares*, the U.S. District Court for the Eastern District of Virginia confronted the constitutionality of Chapter 23.2 of Title 59.1 of the Virgina Code ("Chapter 23.2").

173. Enacted in 2024, Chapter 23.2 establishes a state regulatory framework that commands the Attorney General of Virigina to establish and maintain a directory of liquid nicotine and nicotine vapor products approved for manufacture and sale in Virginia.

174. To appear in the directory, vape manufacturers must provide documentation showing either FDA premarket authorization or that a product is currently under FDA review, with no final decision yet issued. Va. Code § 59.1–293.16.

175. Section 59.1–293.20 prohibits manufacturing, selling or distributing any product not listed in the directory and authorizes enforcement by the Attorney General of Virigina, the Virigina Department of Taxation, and other Virigina state law enforcement agencies. *Id.* § 59.1–293.20(A)–(D).

176. Civil penalties of $1,000 per day may be imposed both for offering non-listed products for sale and for failing to cooperate with audits or inspections related to recordkeeping requirements. *Id.* §§ 59.1–293.19–20.

177. Section 59.1–293.17 authorizes the Attorney General of Virginia to remove or exclude manufacturers or products from the directory for failure to comply with various certification requirements. *Id.* § 59.1–293.17(A).

178. Significantly, where a product is removed from the directory, retailers, distributors and wholesalers must sell remaining inventory within a specified period or otherwise remove it from commerce, after which the product becomes subject to seizure, forfeiture and destruction. *Id.* § 59.1–293.17(D).

179. The U.S. District Court for the Eastern District of Virginia held that Sections 591.–293.17(D) and 59.10293.20(A)–(D) were preempted by the FDCA and TCA, reasoning:

> The Court recognizes both Virginia's interest in advancing its citizens' public health through exercises of its traditional police powers as well as the broad police powers states hold in governing tobacco sales. However, states cannot enforce the FDCA and therefore may only regulate vape products through proper exercise of their police powers. Consistent with this framework, the Court refuses to find Chapter 23.2 invalid in its entirety. *However, the Court will not countenance Virginia's efforts to use Chapter 23.2 and its Directory requirement as a backdoor mechanism to enforce the FDCA.* Thus, to the extent that Chapter 23.2's provisions condition lawful market access or impose state law penalties based directly on FDA premarket authorization determinations, such provisions cross the line from regulating sales to enforcing federal requirements.

*Nova Distro*, 2025 WL 3680321, at *23 (citation, quotation marks, and footnote omitted; emphasis added).

180. The District Court thus enjoined the Attorney General of Virginia and Virginia Tax Commissioner from implementing and enforcing Sections 591.– 293.17(D) and 59.10293.20(A)–(D).

**Pennsylvania Adopts Act 57**

181. On December 22, 2025, the General Assembly enacted Act 57.

182. Act 57 amends and supplements the Commonwealth's Fiscal Code by, *inter alia*, adding Article II-I at 72 P.S. §§ 201–I to 206–I pertaining to the

35

manufacture, importation, wholesaling, and retail sale of e-cigarettes in the Commonwealth.

183. Act 57 became effective on February 20, 2026, with limited exceptions. Act 57, § 5(2) (providing that the remainder of Act 57 shall take effect within 60 days).

184. Act 57 shares the same four key features with other registry laws: (1) manufacturers of e-cigarettes must certify to a state agency that their products have received marketing granted orders from the FDA or are the subject of pending PMTAs, 72 P.S. § 206–I(b); (2) all e-cigarettes so certified are added to a statewide directory, *id.* § 206–I–(g); (3) all e-cigarettes not contained in the statewide directory (*i.e.*, all e-cigarettes without pending PMTAs or marketing granted orders) are barred from sale, *id.* § 206–I(n); and (4) persons violating the sales prohibition are subject to a series of escalating series of civil penalties, *id.* § 206–I(o).

185. Act 57's certification (or registration) provision provides that, within 60 days of Act 57 becoming effective, and annually thereafter:

> [E]very manufacturer of [e-cigarettes] that are sold for retail sale in this Commonwealth, whether directly or through an importer, wholesaler, retailer or similar intermediary or intermediaries, shall execute and deliver to the Attorney General a certification, under penalty of perjury on a form and in the manner prescribed by the Attorney General, that the manufacturer is compliant with this section, agrees to continue to comply with this section, has posted the surety bond required by subsection (k) and that, for each [e-cigarette]:

(i) *the manufacturer has received a marketing granted order for the [e-cigarette] from the FDA in accordance with 21 U.S.C. § 387j* (relating to application for review of certain tobacco products);

(ii) *the manufacturer has submitted a timely filed premarket tobacco product application for the [e-cigarette] to the FDA under 21 U.S.C. § 387j and the application either remains under review by the FDA or has received a denial order that has been and remains stayed by the FDA or court order, rescinded by the FDA or vacated by a court*; or

(iii) the manufacturer was not required to submit an additional premarket tobacco product application for the [e-cigarette] because the [e-cigarette] reflects changes to the name, brand style or packaging of an [e-cigarette] that is covered under subparagraph (i) or (ii).

72 P.S. § 206–I(b)(1) (emphasis added).

186. Act 57's certification provision even accounts for the possibility that the Federal Government "issues subsequent regulations, official guidance or a formal policy statement changing compliance requirements or standards for an electronic cigarette to be federally compliant"—and mandates that each manufacturer of electronic cigarettes "submit documentation to the Attorney General substantiating compliance with new Federal requirements or standards within 30 days of the date compliance is mandated." *Id.* § 206–I(b)(2).

187. Act 57's directory provision states that the Attorney General "shall maintain and make available . . . a directory that lists all manufacturers of [e-cigarettes] . . . for which certification forms have been submitted and approved by

the Attorney General" by no later than 120 days from Act 57's effective date (*i.e.*, June 20, 2026). *Id.* § 206–I(g).

188. Act 57's ban provision provides that e-cigarettes not included in the directory "may not be sold for retail sale in the Commonwealth either directly or through an importer, wholesaler, retailer, or similar intermediary or intermediaries" within 120 days of Act 57 becoming effective or directory's publication, whichever is later. *Id.* § 206–I(n).

189. Each retailer, wholesaler, or importer of products not listed in the directory will have 120 days from the date the directory is published to sell any such products already in inventory, after which they will be deemed "contraband and are subject to seizure, forfeiture and destruction, and may not be purchased or sold for retail sale in the Commonwealth." *Id.* § 206–I(n)(3).

190. Similarly, each retailer, wholesaler, or importer of any products removed from the directory will have 30 days from such product's removal to sell the offending product or remove it from inventory and return it to the manufacturer for disposal. *Id.* § 206–I(m).

191. All costs of destruction shall be borne by the person or entity from whom unlisted products are seized, subject to a limited exception that is inapplicable here. 72 P.S. § 206–I(n)(3), (m).

192. To determine compliance and enforce the ban on unlisted products, AG Sunday or Secretary Browne may perform unannounced compliance checks and examine books, papers, invoices, and other records. *Id.* § 206–I(q) & –(s).

193. AG Sunday or Secretary Browne may seek the following civil penalties against any retailer, wholesaler, or importer found to have violated the ban on unlisted products:

    a. "A civil penalty of $500 for each product offered for sale in violation of this section until the offending product is removed from the market or until the offending product is properly listed on the directory;"

    b. "For a second violation within a 12-month period, a civil penalty of at least $750 but not more than $1,000 per day per product, and the license of the licensee shall be suspended for at least 14-days;" and

    c. "For a third violation within a 12-month period, a civil penalty of at least $1,000 but not more than $1,500 per day per product, and the license of the licensee shall be revoked."

72 P.S. § 206–I(o)(1).

194. AG Sunday or Secretary Browne may additionally seek a civil penalty of $1,000 per product against any manufacturer found to have violated the ban on unlisted products until the offending product is either removed from the market or properly listed on the directory. *Id.* § 206–I(o)(2).

195. Attorney General Sunday or Secretary Browne may additionally seek criminal penalties, fines, and costs for violations of the ban on unlisted products. *Id.* § 206–I(r).

196. Further, the Commonwealth shall be entitled to recover costs and fees arising from its enforcement of Act 57. *Id.* § 206–I(o)(9)–(10).

197. Finally, Act 57 creates a private cause of action for its enforcement by providing that "[a] violation of this section [72 P.S. § 206–I] shall be deemed to be an unfair or deceptive act or practice in violation of . . . the Unfair Trade Practices and Consumer Protection Law." *Id.* § 206–I(o)(6).

198. Sections 206–I(m) ("Returns"), (n) ("Prohibition"), (o) ("Penalties"), (q) ("Enforcement"), (r) ("Violations"), and (s) ("Compliance") are referred to collectively as the "Act 57 Enforcement Provisions."

199. Legislative history for Act 57 confirms that the Act 57 Enforcement Provisions were intended to enforce the FDCA vis-à-vis state officials or private parties.

200. The Senate Appropriations Committee Fiscal Note for Act 57 (then known as House Bill 1425) states that "[t]he bill establishes the ENDS directory to deter the sale of electronic cigarettes that are not compliant with federal law and regulation. . . . *State law is tied to federal law*, so if additional federal regulations are imposed, the Commonwealth's law will comport." Pennsylvania Senate

Appropriations Committee Fiscal Note for House Bill 1425 at 1 (emphasis added), attached hereto as "**Exhibit H**."

201. A co-sponsor memorandum for Act 57 similarly explains that Act 57 is intended to confirm whether e-cigarettes have pending PMTAs or marketing granted orders, as the FDA offers "states . . . no way to enforce the law [*i.e.*, the FDCA] and keep these illicit vapor products off convenience store shelves." House Co-Sponsorship Memo 45333 Information at 1 (Jan. 27, 2025), attached hereto as "**Exhibit I**."

202. The text, structure, history, and purpose of the Act 57 Enforcement Provisions thus reinforce the conclusion that there is no basis for enforcement under Pennsylvania law without an underlying violation of the FDCA.

**Harm to Plaintiffs Caused by Act 57**

203. Tobacco Hut and Nova Distro are part of a family business run by four brothers.

204. Nova Distro is the manufacturing, importing, and distribution arm of the family business, while Tobacco Hut is the retail arm.

205. For its part, 101 Distributors is a wholesale distributor of e-cigarettes to Tobacco Hut and other businesses in Pennsylvania.

206. Tobacco Hut has 33 locations in the Commonwealth of Pennsylvania that collectively employ over 170 people.

207. In 2025, Tobacco Hut collectively paid approximately $456,000 in payroll taxes and $1.58 million in sales taxes to the Commonwealth of Pennsylvania.

208. Tobacco Hut sells cigars, cigarettes, e-cigarettes, and other related products.

209. At least 60% of Tobacco Hut's net profits are derived from sales of e-cigarettes without pending PMTAs or marketing granted orders, due to the small profit margins for cigars, cigarettes, and other related products.

210. The directory provision of Act 57 will take effect no later than June 20, 2026.

211. Once that provision takes effect, Tobacco Hut will be prohibited from selling e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders under Act 57.

212. Without the net profits from such sales, Tobacco Hut would not be able to cover its overhead, payroll, and other expenses.

213. Per Act 57, within 120 days from the directory provision taking effect, Tobacco Hut will face the prospect of the Commonwealth seizing and destroying approximately $2 million in inventory consisting of e-cigarettes without pending PMTAs or marketing granted orders.

214. The lack of net profits, coupled with the seizure and destruction of seven-figures worth of inventory, would force Tobacco Hut to close all of its stores across the Commonwealth and lay off all of its employees.

215. Nova Distro and 101 Distributors would each suffer a similar fate.

216. Nova Distro currently employs 21 people.

217. Nova Distro has purchased a significant stock of e-cigarettes without pending PMTAs or marketing granted orders.

218. In addition to importing and distributing e-cigarettes manufactured by others, Nova Distro manufactures and distributes its own brand of e-cigarette, known as the "Hut Bar," for exclusive sale at Tobacco Hut.

219. None of the e-cigarettes that Nova Distro currently manufacturers have FDA premarket authorization.

220. While Nova Distro operates in Maryland, Ohio, Pennsylvania, Virginia, and West Virgina, at least 70% of Nova Distro's net profits are derived from sales of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders.

221. Without the net profits from such sales, Nova Distro would not be able to cover its overhead, payroll, and other expenses.

222. The lack of net profits would force Nova Distro out of business.

223. 101 Distributors currently employs three people.

224. At least 50% of 101 Distributors' net profits are derived from sales of e-cigarettes in Pennsylvania without pending PMTAs or marketing granted orders.

225. Without the net profits from such sales, 101 Distributors would not be able to cover its overhead, payroll, and other expenses.

226. 101 Distributors has purchased a significant stock of e-cigarettes without pending PMTAs or marketing granted orders.

227. That stock is warehoused in Pennsylvania, and therefore, subject to seizure by the Commonwealth once the directory provision takes effect.

228. The lack of net profits, coupled with the potential seizure of a substantial portion of its inventory, would force 101 Distributors out of business.

## COUNT I
### Express Preemption
### (Plaintiffs v. Defendants)

229. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

230. "A fundamental principle of the [United States] Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. CONST., art. VI. cl. 2).

231. Under the Supremacy Clause of the United States Constitution, federal law preempts state law when, *inter alia,* the federal law expressly preempts state law.

44

232. Under Section 387p of the TCA, Congress preempted States from incorporating measures relating to the sale, distribution, possession, or use of tobacco products and from imposing any measures relating to tobacco product standards. 21 U.S.C. § 387p.

233. As set forth above, the Act 57 Enforcement Provisions condition the manufacture, wholesale, and retail sale of e-cigarettes in Pennsylvania on federal regulatory compliance by, *inter alia*:

a. Prohibiting retailers and wholesalers from purchasing and/or offering any products not listed in the directory (*i.e.*, any products without pending PMTAs or marketing granted orders) within 120 days of the directory's publication, 72 P.S. § 206–I(n);

b. Requiring retailers, wholesalers, and importers to return to the manufacturer any products removed from the directory any products removed from the directory within 30 days of such removal, *id.* § 206–I(m);

c. Imposing escalating civil penalties on manufacturers, importers, wholesalers, and retailers for violating the prohibition on purchase and/or sale of products not listed in the directory and establishing a private cause of action under the Unfair Trade Practices and Consumer Protection Law for the enforcement of the same, *id.* § 206–I(o);

d. Authorizing AG Sunday or Secretary Browne to examine the books and records of any person in possession, control, or occupancy of any premises where e-cigarettes are placed, stored, sold, or offered for sale for purposes of determining compliance with the directory-based provisions of Act 57, *id.* § 206–I(q);

e. Authorizing the imposition of criminal penalties on any person who violates the directory-based provisions of Act 57, including its provisions banning the sale of products not listed in the directory, *id.* § 206–I(r); and

45

f. Authorizing unannounced compliance checks on each importer, wholesaler, and retailer that sells or distributes e-cigarettes for purposes of determining compliance with the directory-based provisions of Act 57, including its provisions banning the sale of products not listed in the directory, *id.* § 206–I(s).

234. Because they are entirely contingent on determinations made by the FDA under the FDCA, as amended by the TCA, the Act 57 Enforcement Provisions are expressly preempted under Section 387p.

## COUNT II
### Implied Preemption
### (Plaintiffs v. Defendants)
### (In the Alternative)

235. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

236. In the event that it is found that the Act 57 Enforcement Provisions are not expressly preempted under Section 387p, then Plaintiffs assert that the Act 57 Enforcement Provisions are subject to implied preemption.

237. Under the Supremacy Clause of the United States Constitution, federal law preempts state law when "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

46

238. Under the doctrine of implied conflict preemption, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby*, 530 U.S. at 372.

239. Congress' intention was to provide the federal government the sole authority to enforce the FDCA. *See* 21 U.S.C. § 337(a) ("all such proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States").

240. In other words, the FDCA's enforcement provisions "commit complete discretion to [the FDA] to decide how and when [the enforcement provisions] should be exercised." *Heckler v. Chaney*, 470 U.S. 821, 835 (1985); *see also Iowans for Alts. to Smoking & Tobacco, Inc.*, 781 F. Supp. 3d at 737 ("Section 337(a)'s reservation of enforcement authority to the federal government applies with equal force to tobacco products regulated under the TCA as it does to other FDCA-regulated products.").

241. The Act 57 Enforcement Provisions stand as an obstacle to the FDA's exclusive authority to enforce the FDCA requirements regarding the manufacture, importation, wholesaling, and retail sale of e-cigarettes in the Commonwealth because they, *inter alia*, authorize AG Sunday and Secretary Browne, as well as private plaintiffs under the UTPCPL, to take enforcement action against e-cigarettes

without pending PMTAs or marketing granted orders in place of the FDA. *See Buckman*, 531 U.S. at 353.

242. Because "the existence of [the FDCA]" is a "critical element" of the enforcement provisions in Act 57, *Buckman*, 531 U.S. at 353, those enforcement provisions are impliedly preempted under Section 337(a).

## <u>COUNT III</u>
### Section 1983 – Substantive Due Process
### (Nova Distro v. AG Sunday)

243. Nova Distro incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

244. The Due Process Clause under the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. IX.

245. Section 1983 of Title 42 of the United States Code establishes a private cause of action for violation of constitutional rights by state actors. 42 U.S.C. § 1983.

246. AG Sunday is a state actor for purposes of Section 1983.

247. It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.

248. As set forth above, Nova Distro manufactures and distributes its own brand of e-cigarette, known as the "Hut Bar," for exclusive sale at Tobacco Hut.

48

249. AG Sunday may deny a manufacturer's certification under Act 57 if, *inter alia*, the manufacturer "was denied listing or was involuntarily removed from another state's electronic cigarette directory and the agency decision is final and no longer subject to appeal, if the other state's directory has requirements similar to those of the directory under this section." 72 P.S. § 206–I(j)(2).

250. Without "explicit standards" guiding what makes another state's directory similar to that established under Act 57, this provision "impermissibly delegates basic policy matters" to AG Sunday, *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972), in violation of the Due Process Clause under the Fourteenth Amendment to the United States Constitution.

251. As a direct and proximate cause of that conduct, Nova Distro will suffer irreparable harm that cannot be compensated by money damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants David W. Sunday, Jr. in his official capacity as the Attorney General of Pennsylvania and Patrick M. Browne in his official capacity as the Secretary of Revenue of Pennsylvania, and grant the following relief:

a. Declare Sections 206-I(j)(2), (m), (n), (o), (q), (r), and (s) of Act 57 unconstitutional;

b. Enjoin AG Sunday and Secretary Browne from implementing and/or enforcing Sections 206-I(j)(2), (m), (n), (o), (q), (r), and (s) of Act 57;

c.  Grant attorney's fees and costs to Plaintiffs; and

d.  Order such further relief this Court deems just and proper.

Respectfully submitted,

*/s/ Casey Alan Coyle*
Casey Alan Coyle, Esquire
PA ID No. 307712
BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.
300 N. Second Street, Suite 801
Harrisburg, PA 17101
(717) 868-8378
ccoyle@babstcalland.com

Joseph V. Schaeffer, Esquire
PA ID No. 323256
BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.
Two Gateway Center, Floor 6
603 Stanwix St.
Pittsburgh, PA 15222
(412) 394-5499
jschaeffer@babstcalland.com

Stewart R. Pollock, Esquire
VA ID No. 981381 (*pro hac vice pending*)
MORAN REEVES & CONN, P.C.
1211 E. Cary Street
Richmond, Virgina 23219
(804) 864-4832
spollock@moranreevesconn.com

*Counsel for Plaintiffs*

Dated: May 20, 2026

<u>**VERIFICATION**</u>

I, Raad Saleh, hereby verify that I am authorized to make this verification on behalf of Plaintiffs MMA Group 1 Inc. d/b/a Tobacco Hut State College Inc., Tobacco Hut Altoona 1 Inc., Tobacco Hut at Hermitage Inc., Tobacco Hut Butler Inc., Tobacco Hut Butler 2 Inc., Tobacco Hut Carlisle Inc., Tobacco Hut Chambersburg Inc., Magd Group Inc. d/b/a Tobacco Hut Ephrata Inc., Tobacco Hut Gettysburg 1 Inc., ALAMINE Inc. d/b/a Tobacco Hut Greensburg Inc., Tobacco Hut Hanover Inc., Tobacco Hut Harrisburg 1 Inc., Tobacco Hut Harrisburg 2 Inc., Tobacco Hut Johnstown 1 Inc., Tobacco Hut Lancaster 1 Inc., Tobacco Hut Littletown Inc., Tobacco Hut Mechanicsburg Inc., Tobacco Hut Mechanicsburg 2 Inc., Tobacco Hut Parkville Inc., Tobacco Hut Sharon Inc., Tobacco Hut Waynesboro Inc., Tobacco Hut Wilkes-Barre Inc., Tobacco Hut York 1 Inc., Tobacco Hut York 2 Inc., Tobacco Hut York 3 Inc., Tobacco Hut & Gift Chambersburg Inc., Tobacco Lux Chambersburg Inc., Tobacco Lux York Inc., THV 54 Inc., THV 56 Inc., THV 71 Inc., RTH 3 Inc., RTH 3B Inc. (collectively "Tobacco Hut"), and Nova Distro, Inc.

I also verify that the statements in the foregoing VERIFIED COMPLAINT are true and correct to the best of my knowledge, information, and belief, save the allegations pertaining to Plaintiff 101 Distributors, LLC (which are separately being verified by Mr. Patel). I understand that the statements in the foregoing

document are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Dated: May 19, 2026

_____
Raad Saleh

## VERIFICATION

I, Kenny Patel, hereby verify that I am authorized to make this verification on behalf of Plaintiff 101 Distributors, LLC. I also verify that the statements in the foregoing VERIFIED COMPLAINT are true and correct to the best of my knowledge, information, and belief to the extent they relate to 101 Distributors (the remaining allegations are being separately verified by Mr. Saleh). I understand that the statements in the foregoing document are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Dated: May 19, 2026

_____
Kenny Patel