**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MMA GROUP 1 INC., d/b/a Tobacco Hut State College Inc., *et al.*,** | : | **No. 3:26cv1385** |
| **Plaintiffs** | : | **(Judge Munley)** |
| **v.** | : | |
| **DAVID W. SUNDAY, JR., in his official capacity as Attorney General of the Commonwealth of Pennsylvania; and PATRICK M. BROWNE, in his official capacity as Secretary of Revenue of the Commonwealth of Pennsylvania,** | : | |
| **Defendants** | : | |

# MEMORANDUM

Plaintiffs sell electronic nicotine delivery systems ("ENDS"), which are better known as e-cigarettes or vapes. Vapes contain nicotine. Nicotine is an addictive chemical. The United States Food and Drug Administration ("FDA") regulates nicotine vapes as a tobacco product. FDA authority comes from provisions in the Family Smoking Prevention and Tobacco Control Act ("TCA") and the Federal Food, Drug, and Cosmetic Act ("FDCA"). The FDA has decided to take a particular enforcement approach to nicotine vapes that lack federal approval. This approach has allowed retailers to sell such products in their Pennsylvania stores.

In response, the Commonwealth enacted Act 57 of 2025 last December and the law is codified at 72 PA. STAT. § 206-I. Act 57 prohibits the retail sale of nicotine vapes that are not listed in an ENDS directory maintained by the state Attorney General. A product may be listed in the directory if its manufacturer certifies that the product has federal marketing authorization or falls within a category of products still under federal review.

Plaintiffs make and sell vapes that are not federally authorized and are thus ineligible for listing in the state ENDS directory. These proprietors contend that if the Act 57 enforcement provisions are allowed to take full effect, it will be a disaster for their businesses. Per the plaintiffs, the law will cause them to shutter their stores and lay off workers across the state.

To fend off this outcome, plaintiffs filed this action seeking to invalidate portions of Act 57 before state authorities come in and seize unlisted nicotine vapes as contraband. They assert that Act 57 is preempted by the TCA and the FDCA.[1] Plaintiffs request a declaration that seven provisions of Act 57 are unconstitutional. They also request an order enjoining Pennsylvania's Attorney General and Revenue Secretary from implementing and enforcing these provisions.

---

[1] The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 since it arises under the Constitution and laws of the United States.

After careful consideration, no such declaration or injunction will be issued in this case. Act 57 is not preempted. Summary judgment will be entered in favor of the defendants on this issue for the reasons that follow.

**Background**

**1. FDCA and TCA Provisions**

For much of our history, tobacco products were regulated by the states and by local governments. R.J. Reynolds Tobacco Co. v. County of Los Angeles, 29 F.4th 542, 547 (9th Cir. 2022). Between 1965 and 2000, Congress enacted various statutes concerning warning requirements, advertising limits, and age restrictions.[2] FDA v. Wages & White Lion Invs., LLC, 604 U.S. 542, 550 (2025). When the FDA attempted to assert jurisdiction over tobacco products by regulation in 1996, the United States Supreme Court rejected that effort as beyond the statutory authority of the FDCA. Id. at 551 (citation omitted).

In 2009, the TCA changed that. Id. Under its amendments to the FDCA, the FDA was granted regulatory authority over cigarettes and "'any other tobacco products' that the FDA 'by regulation deems' to meet the definition of a tobacco product." Id. (quoting 21 U.S.C. § 387a(b)).

[2] These statutes "never preempted state and localities' traditional power to restrict or ban sales of tobacco products." County of Los Angeles, 29 F.4th at 548–49 (citing Graham v. R.J. Reynolds Tobacco Co., 857 F.3d 1169, 1186–87 (11th Cir. 2017) (en banc)).

The TCA prohibits manufacturers "from marketing any 'new tobacco product' without FDA authorization." Id. (quoting 21 U.S.C. § 387j(a)(2)(A)). The law requires manufacturers of "new tobacco products" to submit Premarket Tobacco Product Applications ("PMTAs") and receive authorization from the FDA before introducing those products into the market. Avail Vapor, LLC v. FDA, 55 F.4th 409, 414 (4th Cir. 2022) (citing 21 U.S.C. § 387j(a)(2)(A)). After receiving a PMTA from a manufacturer, the FDA issues either a marketing granted order or a marketing denied order under the mechanics of the statute and implementing regulations. 21 U.S.C. § 387j(c); 21 C.F.R. §§ 1114.5, 1114.31. Companies that sell "new tobacco products" without authorization are subject to "stiff penalties" ranging from civil monetary penalties to imprisonment. Wages & White Lion Invs., 604 U.S. at 555 (citing 21 U.S.C. §§ 331(a), 333(a)(1), (f)(9)).

Although "[t]he TCA's reach was broad," the FDA did not initially classify nicotine-containing vapes as a "tobacco product" subject to the FDCA. Id. at 551, 555. In 2016, however, the FDA issued regulations interpreting "tobacco product" to include e-cigarettes containing nicotine derived from tobacco. Id. at 555 (citing 81 Fed. Reg. 29028 (2016)). In 2022, Congress amended the TCA to clarify that "tobacco product" also includes e-cigarettes containing nicotine derived from synthetic, non-tobacco sources. Pub. L. No. 117-103, § 111, 136 Stat. 49, 789 (2022) (codified at 21 U.S.C. § 321(rr)(1)). That means nicotine e-

cigarettes and vapes require PMTA review and FDA authorization before they may be lawfully marketed. Avail Vapor, 55 F.4th at 414.

That history aside, this case is about the states, their police powers, carve-outs to federal statutes, and cooperative federalism. In short, the TCA "authorized the FDA to regulate tobacco products and expressly preempted some contrary state or local regulations, while also expressly preserving and saving from preemption other state and local regulatory authority over tobacco." County of Los Angeles, 29 F.4th at 547–48. Put another way, Congress "expressly sought to address the legality of state regulation of tobacco products through a carefully balanced preemption scheme consisting of a preservation clause, a preemption clause, and a savings clause." Spencer v. Vapor Tech. Ass'n, No. SC-2025-0800, ___ So. 3d ___, 2026 WL 1902082, at *4 (Ala. July 2, 2026) (citing 21 U.S.C. § 387p). The TCA's "unique preemption structure gives the federal government exclusive power to set 'tobacco product standards,' while preserving state, local, and tribal authority to regulate or ban sales of those products altogether." County of Los Angeles, 29 F.4th at 552.

Recall the stiff federal penalties mentioned above. Despite the possibility of monetary penalties or a federal jail sentence, "[u]nauthorized ENDS products" like vapes and e-cigarettes "are widely available because the FDA has adopted a deferred, case-by-case enforcement regime[.]" Iowans for Alts. to Smoking &

Tobacco, Inc. v. Mosiman, 183 F.4th 1040, 1046 (8th Cir. 2026). That situation has caused the states to enact legislation creating product registry laws, which, per plaintiffs, conflicts with a provision of the FDCA. That provision states: "all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a).

**2. Act 57 of 2025**

At least 16 states now have some form of e-cigarette registry or ENDS directory law.[3] Act 57 is one of those laws. 72 PA. STAT. § 206-I. Pennsylvania's General Assembly intended Act 57 "to establish effective tools for use by the [revenue] department and the Attorney General to prevent and deter the sale of electronic cigarettes that contain nicotine in the Commonwealth which have not been certified[.]" § 206-I (a).

Certification means that "every manufacturer" of nicotine vapes sold for retail sale must "execute and deliver to the Attorney General . . . under penalty of perjury" a form indicating that the manufacturer "is compliant with this section, agrees to continue to comply with this section, [and] has posted [a] surety

[3] See ALA. CODE § 28-11-17.1 (2025); FLA. STAT. § 569.311 (2024); IOWA CODE § 453A.52 (2025); KY. REV. STAT. ANN. § 438.308 (West 2025); MISS. CODE ANN. §§ 27-69-1, *et seq.*; NEB. REV. STAT. § 77-4011.01 (2024); N.C. GEN. STAT. § 143B-245.12 (2025); OKLA. STAT. tit. 63 § 1-229.35 (2022); S.C. CODE. ANN. § 44-95-65 (2026); TENN. CODE ANN. § 67-4-1034 (2025); UTAH CODE ANN. § 59-14-810 (West 2026); VA. CODE ANN. § 59.1-293.15 (2026); WIS. STAT. ANN. § 995.15 (2025).

bond[.]"[4] § 206-I (b)(1). "[F]or each electronic cigarette that contains nicotine" the manufacturer must also annually certify that:

1) It has received a marketing granted order from the FDA in accordance with 21 U.S.C. § 387j;

2) It has submitted a timely PMTA to the FDA under 21 U.S.C. § 387j "and the application either remains under review by the FDA or has received a denial order that has been and remains stayed by the FDA or court order, rescinded by the FDA, or vacated by a court;" or

3) It was not required to submit a PMTA because the product "reflects changes to the name, brand style or packaging of an electronic cigarette that contains nicotine that is covered under" the above provisions.

§ 206-I (b)(1)(i)–(iii).

The certification requirement contains an ongoing obligation tied to federal law and regulations. § 206-I (b)(2). That is, to the extent that 21 U.S.C. § 387j is amended, the federal government issues subsequent regulations, official guidance, or a formal policy statement changing compliance requirements for nicotine vapes, each manufacturer "shall submit documentation to the Attorney General substantiating compliance with the new Federal requirements or standards within 30 days of the date compliance is mandated." Id. Additionally, a manufacturer must notify the Attorney General within 30 days of "any material change to the certification form, including the issuance or denial of a marketing

---

[4] Under Act 57, manufacturers seeking certification must submit a surety bond of at least $50,000. 72 PA. STAT. § 206-I (k)(1).

order by the FDA under 21 U.S.C. § 387j, or any other order or action by the FDA or any court that affects the ability of the [nicotine vape] to be introduced or delivered into interstate commerce for commercial distribution in the United States." § 206-I (f).

Annual certification must be accompanied by the marketing granted order issued by the FDA, the FDA acceptance letter for a timely-filed PMTA, or a document issued by the FDA or a court confirming that the PMTA has resulted in a denial order that "has been and remains stayed by the FDA or court order, rescinded by the FDA or vacated by a court." § 206-I (d)(1). Annual certification also comes with a fee: $2,000 for each brand family and $200 for each brand style during the first year of certification and an annual payment thereafter of $1,000 for each brand family and $100 for each brand style. § 206-I (d)(2). The state Attorney General is also empowered to require e-cigarette manufacturers to submit additional evidence to verify compliance with Act 57, such as samples, sales invoices, product SKUs, federal application records, and sworn affidavits. § 206-I (h).

Act 57 outlines specific grounds under which the state Attorney General can deny a manufacturer's directory certification. § 206-I (j). These disqualifying factors include selling uncertified products in the state, involuntary removal from another state's ENDS directory, denial of listing in another state's ENDS

directory, failing to provide required compliance information, violating federal nicotine packaging standards, or holding certain criminal convictions. § 206-I (j)(1)–(6). The law also provides for a notice and opportunity to cure for manufacturers before the state Attorney General may deny certification. § 206-I (*l*).

Act 57 had an effective date of February 20, 2026. 2025 Pa. Legis. Serv. Act 2025-57 (H.B. 1425) (West). Under the statute, the state Attorney General is responsible for publishing a directory on the office's website listing "all manufacturers of electronic cigarettes that contain nicotine, brand names, categories, such as e-liquid, e-liquid cartridge, e-liquid pod or disposable, product names and flavors for which certification forms have been submitted and approved by the Attorney General[.]" § 206-I (g). The directory was first published on June 20, 2026. (Doc. 34, Pl. SOF, ¶ 84).

Act 57 contains a prohibition subsection. 72 PA. STAT. § 206-I (n). Under that subsection, e-cigarettes may not be sold at retail 120 days after the effective date of the statute or 120 days after the directory is published, whichever is later, unless that product is included in the Attorney General's directory. Id. This subsection includes sell-through provisions. That is, each retailer of e-cigarettes is afforded 120 days from the date of directory publication to sell products that were in its inventory and not included in the directory. § 206-I (n)(1). Otherwise,

these products must be removed from their inventory. Id. Similarly, the statute may be construed to afford wholesalers with 120 days from the date of directory publication to remove products intended for retail sale in the Commonwealth from their inventories if those products are not in the directory. See § 206-I (n)(2).

After the sell-through period, unlisted nicotine vapes are considered contraband and are subject to seizure, forfeiture, and destruction by the state.[5] § 206-I (n)(3). Furthermore, retailers, wholesalers, or importers who sell unlisted nicotine vapes are subject to a wide array of other enforcement actions, such as civil penalties for each product. § 206-I (*o*). Violations of this section are also deemed to be "an unfair or deceptive act or practice" in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. § 206-I (*o*)(6).

Additionally, Act 57 provides that each retailer, wholesaler, importer, or similar intermediary that sells or distributes nicotine vapes is subject to unannounced compliance checks. § 206-I (s). The law further empowers the state Attorney General's office to inspect the books, records, and stock on any Pennsylvania premises where vapes are stored and sold. § 206-I (q).

---

[5] Similarly, products removed from the directory are afforded a 30-day sell-through period before they are subject to seizure, forfeiture, and destruction. 72 PA. STAT. § 206-I (m).

### 3. Tobacco Hut, Nova Distro, and 101 Distributors

Plaintiffs are corporations or LLCs engaged in the manufacture, wholesale distribution, and retail sale of e-cigarettes in Pennsylvania without marketing granting orders or pending PMTAs. (Doc. 34, Pl. SOF, ¶ 64). Most of the plaintiff entities operate Tobacco Hut retail locations. Tobacco Hut employs between 150–180 full-time employees. Id. ¶ 67. Sixty percent of Tobacco Hut's profits are derived from the sale of e-cigarettes. Id. ¶ 74. As of June 2, 2026, Tobacco Hut had $2,000,000 worth of product subject to seizure under Act 57. Id. ¶ 97.

Nova Distro and 101 Distributors are also plaintiffs in this case. Nova Distro makes and distributes vapes to Tobacco Hut locations.[6] (Doc. 26, Hearing Tr., R. Saleh, 34:23–36:6). Tobacco Hut retail locations and Nova Distro are connected family businesses. Id. Nova Distro makes a nicotine vape called the Hut Bar. Id. Tobacco Hut sells the Hut Bar. Id., 41:10-21. It is not FDA approved. Id. Despite the lack of approval, Tobacco Hut has been selling the Hut Bar for two to three years. Id., 42:5-11. Tobacco Hut locations also sell between 200-300 different kinds of nicotine vapes that are not FDA approved. Id., 58:10-15.

---

[6] Nova Distro is also involved in a lawsuit challenging the ENDS directory law in Virginia. See NOVA Distro, Inc. v. Miyares, No. 3:25CV857 (DJN), 2025 WL 3680321 (E.D. Va. Dec. 18, 2025), appeal docketed sub nom., NOVA Distro, Inc. v. Jones, No. 26-1033 (4th Cir. Jan. 9, 2026). That matter is currently pending before the Fourth Circuit.

101 Distributors is a wholesale distributor, which supplies nicotine vapes to the Tobacco Hut retail stores and other convenience stores and smoke shops. (Doc. 26, Hearing Tr., K. Patel, 59:19–60:16). Forty percent of 101 Distributors' profits are derived from the sale of vapes and e-cigarettes. (Doc. 34, Pl. SOF ¶ 75). It would take 101 Distributors between eight months to one year to sell its inventory of e-cigarettes. Id. ¶ 99. 101 Distributors distributes nicotine vapes that have not been approved by the FDA along with ones that have been approved. (Doc. 26, Hearing Tr., K. Patel, 63:24–64:19). Per one of its owners, the vapes that lack FDA approval are more popular. Id., 59:23–60:1, 63:24–64:19.

### 4. Procedural History

Plaintiffs initiated this action on May 20, 2026. (Doc. 1). Counts I and II of the complaint advance express and implied preemption theories challenging 72 PA. STAT. § 206-I (m), (n), (*o*), (q), (r), and (s) ("enforcement provisions").[7] (Doc. 1, ¶¶ 198, 229–242).

---

[7] Count III asserts a substantive due process claim under 42 U.S.C. § 1983 on behalf of Plaintiff Nova Distro, Inc. against David W. Sunday, Jr. in his official capacity as state Attorney General. Id. ¶¶ 243–251. In Count III, Nova Distro challenges a provision of Act 57 which allows the state Attorney General the ability to deny a manufacturer's certification if it was denied listing or removed from a different state's ENDS directory "if the other state's directory has requirements similar to those of the directory under this section." Id.; see 72 PA. STAT. § 206-I (j)(2). Nova Distro alleges that this provision impermissibly delegates basic policy matters to the state Attorney General in violation of the Due Process Clause of the Fourteenth Amendment. (Doc. 1, ¶ 250). In their brief in opposition to the Commonwealth's motion for summary judgment, however, plaintiffs indicate that they will stipulate to the dismissal of Count

On May 21, 2026, plaintiffs filed a motion for preliminary injunction. (Doc. 5). After hearing from witnesses and building an evidentiary record, the court determined that it would be better to address the parties' preemption arguments under a Rule 56 standard versus a preliminary injunction standard. (Doc. 24) (citing Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec., 108 F.4th 194, 197 (3d Cir. 2024)). Plaintiffs' motion for preliminary injunction was converted to a motion for summary judgment ("Plaintiffs' First MSJ"). Id. at 6. Following an expedited period for discovery, plaintiffs filed a supplemental motion for summary judgment ("Plaintiffs' Second MSJ"). (Doc. 33). Plaintiffs' Second MSJ seeks summary judgment on Counts I and II. Id.

The Commonwealth, through its Attorney General and Revenue Secretary, timely filed its own motion for summary judgment. (Doc. 29). Seizure enforcement of unlisted nicotine vapes begins on October 19, 2026. (Doc. 34, Pl. SOF, ¶ 84); 72 PA. STAT. § 206-I (n). The motions are ripe for disposition.

**Standard of Review**

Summary judgment is proper when there is no genuine issue of material fact in the case, and the moving party is entitled to judgment as a matter of law. Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citation omitted); see also

---

III to streamline adjudication of this matter. (Doc. 40 at ECF p. 36, n.6). Accordingly, the court will dismiss Count III without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).

FED. R. CIV. P. 56(a). "A fact is material if its resolution 'might affect the outcome of the suit under the governing law,' . . . [a]nd a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Mall Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Rule 56 standard does not change in the context of cross-filed motions. Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016).

Whether federal law preempts state law is a question of law for the court, and summary judgment is therefore an appropriate vehicle for resolving such questions. See Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 303, 317–18, (2019). The court decides the question even when it depends on subsidiary facts. Id. Plaintiffs bear the burden of showing that provisions of the FDCA and TCA preempt Act 57. R.J. Reynolds Tobacco Co. v. City of Edina, 60 F.4th 1170, 1175 (8th Cir. 2023) (per curiam).

## Analysis

### I. Act 57 is Not Expressly Preempted by the Text of § 387p

Preemption "is a necessary but precarious component of our system of federalism[.]" Sikkelee v. Precision Airmotive Corp., 822 F.3d 680, 687 (3d Cir. 2016). Through the Supremacy Clause, the United States Constitution and the laws of the United States are "the supreme Law of the Land." U.S. CONST. art.

VI, cl. 2. Therefore, Congress has the power to enact laws that preempt state legislation. Sikkelee, 822 F.3d at 687 (citing Arizona v. United States, 587 U.S. 387, 399 (2012)). Federal law may preempt state law expressly by declaring an intent to displace state law. Transource Pa., LLC v. DeFrank, 156 F.4th 351, 372 (3d Cir. 2025) (citing Oneok, Inc. v. Learjet, Inc., 575 U.S. 373, 376–77 (2015)).

In seeking declaratory judgment and injunctive relief in this action, plaintiffs assert that Act 57 is expressly preempted by 21 U.S.C. § 387p(a)(2)(A), a preemption clause within the TCA ("Preemption Clause"). (Doc. 1, Compl. ¶¶ 232–33; Doc. 15, Pl. Br. in Supp. First MSJ, at ECF pp. 16, 18–22). The Preemption Clause prohibits states from establishing requirements "different from, or in addition to any requirement . . . relating to . . . premarket review[.]" 21 U.S.C. § 387p(a)(2)(A). Act 57's correlation to the FDA's premarket review process places it within the Preemption Clause of § 387p(a)(2)(A). As discussed below, however, the Preemption Clause exists within a preservation-preemption-savings structure. Act 57's requirements related to sale place that state statute within the preemption exceptions of the savings clause at § 387p(a)(2)(B) ("Savings Clause").

This conclusion derives solely from the text of the TCA. As recognized, there are two cornerstones of preemption jurisprudence. Wyeth v. Levine, 555 U.S. 555, 565 (2009). One cornerstone, also described as an "ultimate

touchstone," is "the purpose of Congress." Id. (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (citation modified)). "The best evidence" of congressional purpose "is the statutory text adopted by both Houses of Congress and submitted to the President." W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98 (1991). After all, preemption arguments "must be grounded 'in the text and structure of the statute at issue.'" Kansas v. Garcia, 589 U.S. 191, 208 (2020) (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).

The other cornerstone is a presumption against preemption in cases where Congress has legislated in a field traditionally occupied by the states through use of their historic police powers. Wyeth, 555 U.S. at 565. States have historically regulated cigarettes and other tobacco products. Austin v. Tennessee, 179 U.S. 343, 345, 348 (1900); County of Los Angeles, 29 F.4th at 548. However, if a statute contains an express preemption provision, courts do not invoke any presumption against preemption. Puerto Rico v. Franklin Cal. Tax-Free Tr., 579 U.S. 115, 125 (2016). They "instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'"[8]

---

[8] There is a circuit split on this issue. In reviewing whether a local flavored tobacco ban was preempted by § 387p, the Ninth Circuit, citing Franklin, did not apply a presumption against preemption. County of Los Angeles, 29 F.4th at 552–53 n.6. In reviewing whether Iowa's vapor products directory law was preempted by § 387, the Eighth Circuit applied the presumption, Mosiman, 183 F.4th at 1051, as did the Fourth Circuit in Vapor Technology Association v. Wooten, 184 F.4th 329, 346 (4th Cir. 2026) when reviewing North Carolina's law. The Second Circuit also applied the presumption when reviewing New York City's

Id. (quoting Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 594 (2011)). There is an express preemption provision in the TCA, 21 U.S.C. § 387p(a)(2)(A), so no judicial presumption applies. Therefore, both cornerstones of preemption jurisprudence lead back to the preservation-preemption-savings clauses of the statute.

The clauses of § 387p are as follows:

***Preservation Clause*** – **"**Except as provided in paragraph (2)(A)," which is the Preemption Clause, "nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of . . . a State . . . to enact . . . and enforce any law . . . with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law . . . prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products." 21 U.S.C. § 387p(a)(1) ("Preservation Clause").

***Preemption Clause*** – States, however, may not "establish" requirements "different from, or in addition to" federal requirements "relating to tobacco product

flavored tobacco law. U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York, 708 F.3d 428, 434 (2d Cir. 2013).

standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." § 387p(a)(2)(A).

***Savings Clause*** – The Preemption Clause has exceptions, and "does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products." § 387(a)(2)(B).

The Preservation Clause "expressly preserves localities' traditional power to adopt any 'measure relating to or prohibiting the sale' of tobacco products." U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York, 708 F.3d 428, 433 (2d Cir. 2013) (quoting 21 U.S.C. § 387p(a)(1)) (emphasis removed). Through the Preservation Clause, state and local governments "are free to go above and beyond the requirements of the TCA to curb tobacco use." City of Edina, 60 F.4th at 1174. That is, Congress "disclaimed any intent to preempt the tobacco field." Vapor Tech. Ass'n v. Wooten, 184 F.4th 329, 347 (4th Cir. 2026) (citing City of Edina, 60 F.4th at 1174).

The middle preemption layer removes "a few" areas of the tobacco industry from state regulation—"tobacco product standards, pre-market review, adulteration, misbranding, labeling, registration, good manufacturing standards,

and modified risk tobacco products." Id. at 347–48. The Preemption Clause "expressly overrides the preservation clause in the case of any conflict between the two provision's terms." County of Los Angeles, 29 F.4th at 551.

Immediately following the Preemption Clause is the Savings Clause, which "excepts various broadly defined categories from preemption." Id. (citing 21 U.S.C. § 387p(a)(2)(B)). With the Savings Clause, "States maintain the ability to regulate the sale of tobacco products." Wooten, 184 F.4th at 348.

A state tobacco regulation "that is framed as a 'sales ban' would not be preempted because it falls under the Savings Clause." Mosiman, 183 F.4th at 1052 (citing 21 U.S.C. § 387p(a)(2)(B)). The Preservation and Savings Clauses also "show that Congress did not intend to preempt states' authority to regulate the sale of tobacco products." Wisconsinites for Alts. to Smoking & Tobacco, Inc. v. Casey, 172 F.4th 976, 989 (7th Cir. 2026).

Casey, Mossiman, and Wooten address how the Savings Clause makes it unlikely that challengers to other states' ENDS directory laws will succeed on the merits of their preemption arguments. In their briefs, plaintiffs are critical of the ways these cases apply statutory construction principles. Their points are well taken. However, from the various statutory arguments assembled by the plaintiffs—some new, some recycled—the court reaches the same result when it comes to the text of § 387p. Congress demonstrated a clear intent that states

should retain broad powers over tobacco sales. And Act 57, at its core, imposes "requirements relating to the sale, distribution, possession, [and] information reporting to the State" within the scope of the Savings Clause. 21 U.S.C. §387p(a)(2)(B).

For example, plaintiffs argue that Act 57 is not a sales ban and is instead a "backdoor attempt . . . at implementing premarket review." (Doc. 15, Pl. Br. in Supp. First MSJ, at ECF p. 19). The court can assume the truth of that argument and still determine that Act 57 is not preempted. Mosiman, 183 F.4th at 1052 (determining that Iowa's registry law was covered by the Preemption Clause because it involves premarket review).

The TCA contains provisions concerning premarket review of new tobacco products. 21 U.S.C. § 387j. One way to get on the Pennsylvania ENDS directory is for a manufacturer to certify that it received a marketing granted order from the FDA. 72 PA. STAT. § 206-I (b)(1)(i) (citing 21 U.S.C. § 387j). Another way is to certify that:

> the manufacturer has submitted a timely filed premarket tobacco product application for the electronic cigarette that contains nicotine to the FDA under 21 U.S.C. § 387j and the application either remains under review by the FDA or has received a denial order that has been and remains stayed by the FDA or court order, rescinded by the FDA or vacated by a court[.]

72 PA. STAT. § 206-I (b)(1)(ii).

Returning to the preservation-preemption-savings structure of the TCA, the Preemption Clause provides that "No State . . . may establish . . . with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to . . . premarket review." 21 U.S.C. § 387p(a)(2)(A).

"Relating to" is a phrase that "sweeps broadly." Chevron USA Inc. v. Plaquemines Parish, 608 U.S. 1, 11 (2026). As construed, "Relating to":

> mean[s] to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with. One thing can relate to another even if the connection is indirect, even if it was not specifically designed to affect it. And, one thing can relate to another even without a strict causal relationship.

Id. (citation modified).

Each subparagraph of Act 57 refers back, in some way, to the provision at 72 PA. STAT. § 206-I (b) requiring an e-cigarette manufacturer to have FDA approval, a pending PMTA, or a stay of an FDA denial order. Those are matters which concern the federal government's premarket review of tobacco products. Act 57 thus imposes requirements which are "in addition" to federal requirements "relating to" premarket review. The state statute thus falls within TCA's Preemption Clause.

That is not the end of the analysis. The Preemption Clause has exceptions explicitly named in the subsequent Savings Clause. The Preemption Clause

"does not apply to requirements relating to the sale, distribution, possession, [and] information reporting to the State[.]" 21 U.S.C. § 387p(a)(2)(B). The phrase "relating to" from the Preemption Clause appears again in the Savings Clause and is given the same broad effect.

The importance of Act 57's design soon becomes clear. Specifically, the prohibition subsection, challenged here, states that unlisted vapes "may not be sold for retail sale in this Commonwealth either directly or through an importer, wholesaler, retailer or similar intermediary or intermediaries." 72 PA. STAT. § 206-I (n). Act 57's penalty provisions, also challenged here, are attached to selling unlisted vapes or offering them for sale. 72 PA. STAT. § 206-I (*o*). Consequently, Act 57 is a sales ban.

That is not to say that the Savings Clause operates without limits. The meaning of "relating to" is "not so broad that it is meaningless" and "requires a connection that is not tenuous, remote, or peripheral." Plaquemines, 608 U.S. at 11–12 (citation modified). "Relating to" is also limited by ordinary meanings and ordinary understandings. Id. at 12. With that said, Act 57 does not test the outer limits of the Savings Clause. It creates a directory of manufacturer-certified products approved by the FDA or in process and bans sales of products not in the directory. Act 57 thus "fit[s] comfortably" within the Savings Clause of

§ 387p(a)(2)(B) as a sales regulation and as information reporting to the state. See Wooten, 184 F.4th at 348,

In Rocky Patel Premium Cigars, Inc. v. Bonta, the Ninth Circuit assumed that the Preemption Clause applied to an unflavored tobacco list that was tied to California's flavored tobacco ban and held that the Savings Clause rescued it anyway. No. 25-8060, ___ F.4th ___, 2026 WL 2529324, at *4–5. The court reached that holding because the list: 1) was a prerequisite for selling tobacco products in the state; 2) eligibility for sale depended on whether manufacturers or importers proved that a product was unflavored through an application with the state; and 3) the application required product descriptions, FDA status, packaging and marketing information, a sample of the product, and certification that the product lacked a flavor. Per the Ninth Circuit, such requirements focused on retail sales and thus satisfied the TCA's Savings Clause. Id. at *5.

Although Rocky Patel involved banning an entire category of tobacco products, that distinction does not make its reasoning any less persuasive. Under Act 57, manufacturers are obligated to comply with ENDS directory requirements. 72 PA. STAT. § 206-I (a), (g), (n). Eligibility for the directory depends on whether manufacturers prove that their products have a marketing granted order from the FDA, are the subject of a timely filed PMTA which is still pending, or have a stay of an FDA denial order. § 206-I (b). The process

involves an application and other information reporting. § 206-I (b), (c), (d), (h). Such requirements, however, are all prerequisites to sale of the product in the Commonwealth. Consequently, to borrow Eighth Circuit language, even if Act 57 falls into a Preemption Clause bucket, a sales connection scoops it out and places it into a Savings Clause bucket. See City of Edina, 60 F.4th at 1175–76. Therefore, Act 57 is not expressly preempted by the FDA.

## II. Act 57 is Not Preempted by the Implication of § 337

The court turns to plaintiffs' alternative approach to preemption in Count II of their complaint, which asserts that Act 57's enforcement provisions are impliedly preempted under 21 U.S.C. § 337(a). (See Doc. 1 at ¶¶ 235–42; Doc. 15, Pl. Br. in Supp. First MSJ at ECF p. 22). Section 337 sets forth federal enforcement authority under the FDCA: "all . . . proceedings for the enforcement, or to restrain violations of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a).

Implied preemption comes in two main varieties: field preemption and conflict preemption.[9] Conflict preemption occurs when federal law conflicts with state law. Sikkelee, 822 F.3d at 688 (citation omitted). Conflict preemption itself

[9] Field preemption occurs "when Congress legislates so as to 'foreclose any state regulation in the area[.]'" Transource Pa., LLC, 156 F.4th at 372 (quoting Oneok, Inc., 575 U.S. at 377). The Preservation and Savings Clauses within 21 U.S.C. § 387p preclude application of field preemption principles in this case.

is broken down into impossibility preemption and obstacle preemption theories. MD Mall Assocs., LLC v. CSX Transp., Inc., 715 F.3d 479, 495 (3d Cir. 2013). Impossibility preemption is "when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible[.]" Sikkelee, 822 F.3d at 688 (citing PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011)). Obstacle preemption is "when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." Id. (citation modified). As such, the Supremacy Clause "invalidates state law that 'interferes with or is contrary to federal law.'" Farina v. Nokia Inc., 625 F.3d 97, 115 (3d Cir. 2010) (quoting Free v. Bland, 369 U.S. 663, 666 (1962)).

Per the plaintiffs, the Commonwealth is stepping into the FDA's shoes and improperly enforcing the federal premarket review process. (Doc. 15, Pl. Br. in Supp. First MSJ at ECF p. 22). They argue that Section 337(a) is "'clear evidence that Congress intended' the FDCA to be 'enforced exclusively by the Federal Government.'" (Doc. 35, Pl. Br. in Supp. Second MSJ at ECF p. 22). In advancing this argument, plaintiffs look to Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2001) or decisions relying on Buckman. (Doc. 1, Compl. ¶¶ 124, 127, 241–42; Doc. 15, at ECF p. 22; Doc. 35 at ECF pp. 23–24, 33; Doc. 40 at ECF pp. 23–24, 31–32, 36; Doc. 45 at ECF pp. 3). The court

disagrees that implied conflict preemption or Buckman preemption principles invalidate Act 57.

In Buckman, plaintiffs injured by orthopedic bone screws brought state law tort claims against a regulatory consulting firm, alleging that the company made fraudulent representations to the FDA during the clearance process and that the devices would not have reached the market otherwise. 531 U.S. at 343–44. The Supreme Court held that the claims were impliedly preempted by the Medical Device Amendments to the FDCA. Id. at 344, 347. The Court reasoned that "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied,'" so no presumption against preemption applied. Id. at 347 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Per Buckman, the fraud-on-the-FDA claims did not rest on traditional state duties that "predated the federal enactments in question[]" but rather "exist[ed] solely by virtue of FDCA disclosure requirements[,]" such that "the existence of these federal enactments [was] a critical element in [the tort plaintiff's] case." Id. at 352–53.

Similar Buckman-derived arguments were unsuccessful in the challenge to North Carolina's vapor certification directory law. Wooten, 184 F.4th at 350. As the Fourth Circuit reads Buckman, "a state law claim is preempted if, but only if, the plaintiff needs to establish an FDCA violation to prevail on the claim." Id.

(emphasis removed). The Wooten court held that, in tying its enforcement provisions to whether an unregistered vape product was sold in the state, North Carolina's directory law does not require the state to establish an underlying violation of the FDCA. Id. at 350–51. The Fourth Circuit reasoned:

> Indeed, a manufacturer may disagree with the decision of the [state Revenue] Secretary to remove them from the registry for any number of reasons, such as non-payment of the annual fee or for having made a material misstatement in the certification process, and continue to sell their FDA approved vape in North Carolina notwithstanding the Secretary's action. In either circumstance, the manufacturer will have complied with federal law but violated S.L. 2024-31. Because North Carolina can enforce S.L. 2024-31 without establishing an FDCA violation, S.L. 2024-31 does not run afoul of § 337(a).

Id. at 351.

The Seventh Circuit similarly distinguished Buckman in its preemption analysis of Wisconsin's vape registry law. Per that circuit court of appeals decision, Wisconsin's law "asks whether a product has FDA approval. It does not involve an adjudication of a violation."[10] Casey, 172 F.4th at 988.

The court is persuaded that Act 57 is similar and adopts the same reasoning as the above cases. To enforce Act 57, the Commonwealth need only

[10] From a different angle, the Eighth Circuit held that Buckman did not apply to Iowa's vape registry law, because Iowa's law "requires ENDS product manufacturers and retailers to certify that they have complied with FDA requirements . . . [which] promotes, not undermines, the FDA's premarket approval process." Mosiman, 183 F.4th at 1053.

demonstrate that an unlisted nicotine vape was sold or offered for sale in Pennsylvania. 72 PA. STAT. § 206-I (n), (*o*). That showing does not require proof that the FDCA was violated. Furthermore, a manufacturer may be excluded from the directory for reasons having nothing to do with federal law, such as failing to: pay the state's annual fees, post a surety bond, appoint a Pennsylvania agent for service of process, furnish importer declarations, or submit a truthful certification to the Commonwealth. 72 PA. STAT. § 206-I (c), (i), (j), (k), (u). A manufacturer in that position may be in full compliance with federal law and violate Act 57. Therefore, in the case of Act 57, "cross-referencing to FDA approval orders is not equivalent to enforcing the FDCA itself," Casey, 172 F.4th at 989, and the Commonwealth's certification and enforcement provisions do not exert an "extraneous pull" on the federal scheme. Buckman, 531 U.S. at 353.

## III. Plaintiffs' Other Preemption Arguments Fall Short

Plaintiffs remaining arguments fail to discredit the other circuit-level decisions. With respect to the Seventh Circuit's analysis of 21 U.S.C. § 387p, Plaintiffs argue that the Casey court made up propositions out of whole cloth. (Doc. 40, Pl. Br. in Opp. to Def. MSJ at ECF pp. 21–23). Specifically, they challenge this portion of Casey:

> [Challengers] claim, Congress only intended to allow state tobacco regulations that differed from federal regulations. But this argument misconstrues preemption. Implied preemption asks whether state law conflicts with federal

> law. See Altria Grp., Inc. v. Good, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). A state law that mirrors a federal standard does not create a conflict; rather, they impose the same standards. Id. at 76–77, 129 S.Ct. 538. There is no implied conflict preemption if there is no conflict. See Wyeth v. Levine, 555 U.S. 555, 581, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). Accordingly, the TCA permits identical regulations as well regulations "in addition to, or more stringent than" the FDA's requirements. See 21 U.S.C. § 387p(a)(1).

172 F.4th at 988 (citation modified).

To summarize, Casey relies on the Supreme Court's decision in Good for the proposition that states can pass laws mirroring federal standards. While the court does not locate explicit support for that proposition in Good, other Supreme Court decisions do provide support. In the medical device context, the Court has read the preemption clause at 21 U.S.C. § 360k[11] to permit state law duties parallel to federal requirements. Riegel v. Medtronic, Inc., 552 U.S. 312, 330 (2008) (citing Lohr, 518 U.S. at 495).

Plaintiffs' reference to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") provides further support for the above proposition in Casey and undercuts plaintiffs' own arguments about 21 U.S.C. § 387p. (Doc. 35 at ECF p.

[11] Section 360k provides: "no State . . . may establish or continue in effect with respect to a device intended for human use any requirement--(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." 21 U.S.C. § 360k(a).

27–28). Per plaintiffs, a provision of FIFRA, 7 U.S.C. § 136v, is "analogous" to and "uses substantially similar language" to 21 U.S.C. § 387p. (Doc. 35 at ECF p. 27). As the Supreme Court has concluded, however, a state law requirement is not preempted by FIFRA if it is equivalent to federal requirements. Bates v. Dow Agrosciences LLC, 544 U.S. 431, 447 (2005). If the TCA and FIFRA are substantially similar as plaintiffs argue, then Act 57 does nothing to implicate conflict preemption by making federal premarket review one of the conditions precedent to a state ENDS directory listing.

Plaintiffs' repeated references to *expressio unius est exclusion alterius* and the anti-surplusage canon also do not compel a different reading of § 337 or § 387p. (Doc. 35 at ECF pp. 24–27, 32; Doc. 40 at ECF pp. 20, 23). The *expressio unius* maxim translates to "the expression of one thing is the exclusion of the other." United States v. Nasir, 17 F.4th 459, 472 (3d Cir. 2021) (en banc). The canon against surplusage, means "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." Duncan v. Walker, 533 U.S. 167, 174 (2001).

In advancing *expressio unius* arguments, plaintiffs refer to § 337(b) which allows states to initiate proceedings for civil enforcement or to restrain violations of federal provisions related to food safety. Plaintiffs argue that, by negative implication, § 337(b) prevents states from enforcing federal tobacco provisions

through laws like Act 57. (Doc. 35 at ECF pp. 25-26). But as explained above, enforcement of Act 57 is not co-extensive with enforcement of the FDCA. Such an argument also runs counter to plaintiffs' anti-surplusage arguments. If § 337 preempted every state law related to federal tobacco requirements, then the Preservation Clause and Savings Clause in § 387p would have very little, if anything, to do in the statutory scheme applicable to those products.[12] In response to plaintiffs' anti-surplusage arguments, the court's reading of the FDCA and TCA gives effect to all three clauses in § 387p.

As an example of trying to give all three clauses their full effect, in U.S. Smokeless Tobacco, the company challenged New York City's flavored tobacco ordinance, arguing that the law was preempted by the TCA. 708 F.3d at 430. The company argued that the ordinance looked like a sales rule but was really a product standard. Id. at 434. The Second Circuit accepted the company's principle. Id. It agreed that a sales ban which actually orders manufacturers to restructure their operations does not escape preemption just because the law is a sales regulation on its face. Id. (citing Nat'l Meat Ass'n v. Harris, 565 U.S. 452,

[12] Given the federal-state balance struck at 21 U.S.C. § 387p, the statute's preservation-preemption-savings structure might be a good example of why, "[t]he anti-surplusage canon is not an iron rule." Mullin v. Al Otro Lado, 609 U.S. 258, 272 (2026). The canon is a product of assuming that careful writers are usually economical in their use of words, "[b]ut even excellent writers do not always trim every unnecessary word, and the same is true of Congress." Id. Furthermore, while "useful," the anti-surplusage canon "is subordinate to the cardinal canon that a legislature says in a statute what it means and means in a statute what it says there." Id. at 273 (quoting U.S. Postal Serv. v. Konan, 607 U.S. 391, 406 (2026) (citation modified)).

464 (2012)). To give the Preemption Clause full effect, it also observed that states could run afoul of the clause by passing a law encroaching on "the scientifically expert FDA" but determined that the law in question did not do so. Id. at 435. The court, however, refused to extend these principles to every sales ban, "many of which would likely have some effect on a manufacturer's production decisions[.]" Id. at 434. Collapsing any distinction between sales and product standards would, per the Second Circuit, render the TCA's Preservation Clause superfluous. Id.. So, it adopted a narrower reading of the Preemption Clause that also gave effect to the Preservation Clause and the Savings Clause. Id. at 434–35. The Second Circuit read § 387p as a statute that "reserves regulation at the manufacturing stage exclusively to the federal government, but allows states and localities to continue to regulate sales and other consumer-related aspects of the industry in the absence of conflicting federal regulation." Id. Here, Act 57 reserves the premarket review process exclusively to the federal government and uses the outcome of that federal process as one of the conditions precedent for inclusion on a state list of permitted nicotine vapes. It does not encroach on any process used by the FDA in its premarket review of new tobacco products.

In furthering their preemption arguments, plaintiffs also rely on National Meat, referenced by the Second Circuit in the above decision. (Doc. 15, Pl. Br. in

Supp. First MSJ, at ECF pp. 21–22). National Meat refused to allow California to evade the Federal Meat Inspection Act ("FMIA") by framing a regulation of slaughterhouse operations as a ban on selling meat "produced in whatever way the State disapproved." 565 U.S. at 463–64. That is, California's "sales ban" label could not save a state law that, in practice, directed state slaughterhouses how to handle pigs. Id.

National Meat does not change the outcome of this case. The FMIA's savings clause is not the same as the TCA's preservation-preemption-savings structure. Compare 21 U.S.C. § 678 with 21 U.S.C. § 387p(a). To borrow another court's illustration, § 387p has been described by the Ninth Circuit as a "preservation sandwich." Rocky Patel, 2026 WL 2529324, at *2 (quoting County of Los Angeles, 29 F.4th at 550, 555). Adapting this analogy, the Preemption Clause is the meat and cheese, which Congress sandwiched between two slices of preserved and saved state authority. County of Los Angeles, 29 F.4th at 555; see also Utah Vapor Bus. Ass'n Inc. v. Utah, 792 F. Supp. 3d 1226, 1232 (D. Utah 2025), app dismissed, No. 25-4046, ___ F.4th ____, 2026 WL 2561598 (10th Cir. Aug. 31, 2026) ("two pieces of preservation/saving with a slice of preemption in between"). The Savings Clause—or the bottom slice of bread—saves from preemption any state "requirements relating to the sale, distribution, possession, [and] information reporting to the State" among other things. 21

U.S.C. § 387p(a)(2)(B). So, the sales distinction that National Meat rejected is one that Congress authorized in the TCA through the wording of the Savings Clause. County of Los Angeles, 29 F.4th at 557. Act 57 thus operates within the Savings Clause as a sales distinction. It is not preempted. The Commonwealth's motion for summary judgment will be granted.

**Conclusion**

For the reasons set forth above, plaintiffs' motions for summary judgment will be denied. The defendants' motion for summary judgment will be granted. Count III of plaintiffs' complaint will be dismissed at their request pursuant to Federal Rule of Civil Procedure 41(a)(2). The Clerk of Court will be directed to enter judgment in favor of the defendants and against plaintiffs. An appropriate order follows.

**BY THE COURT:**

**Date:** 10/14/26

**JUDGE JULIA K. MUNLEY**
**United States District Court**